14239

PENLEY v. FOUCHE ET AL.

(184 S. E., 120)

Messrs. *Dunlap & Dunlap* and *Douglas & Douglas,* for appellants,

Messrs. *Horace Traylor* and *McDonald, Macaulay & Mc-Donald,* for respondent,

February 26, 1936.

The opinion of the Court was delivered by· MR. JUSTICE CARTER.

This action, by T. H. Penley, as plaintiff, against the defendants, L. W. Fouche and C. I. Cooper, copartners, trading as Cooper Furniture Company, and Marvin Parks, commenced in the Court of Common Pleas for Fairfield County, is a suit against the defendants for recovery of damages against the defendants, jointly, in the sum of $2,500.00. In his complaint, the plaintiff alleges that L. W. Fouche and C. I. Cooper were at the times set forth in the complaint trading and doing business under the firm name of Cooper Furniture Company, and while not alleging the place of their residence, alleged that the said firm had, at the time in question, a store at Winnsboro, S. C., as well as at other towns in this State; and, further alleged that the defendant, Marvin Parks, was at the time of the commencement of this action a citizen and resident of the said County of Fairfield; that "between January 1st, 1928, and September 1st, 1931, plaintiff purchased from the Cooper Furniture Company in the approximate sum of Three Hundred Twenty-five ($325-.00) Dollars, and the plaintiff had paid for all of said purchases except a balance of about Twenty-three ($23.00) Dollars. That plaintiff had purchased other articles of furniture from Cooper Furniture Company and C. H. Douglas which were wholly paid for. That defendant willfully, wan-

tonly, and deceitfully induced plaintiff to store all of his furniture including the artciles for which he had paid cash with Cooper Furniture Company and fraudulently disposed of the furniture contrary to the storage agreement."

According to the agreed statement of counsel, representing the parties litigant, appearing in the transcript of record, the defendants, C. I. Cooper and L. W. Fouche, in their answer alleged, among other things, "That at various times between the 21st day of February, 1928, and the 3rd day of August, 1931, sold and delivered to plaintiff goods and merchandise amounting to Three Hundred Fifty-three and 40/100 ($353.40) Dollars which was sold on written contracts of rent and plaintiff paid under said contracts the sum of Two Hundred Sixty-nine ($269.00) Dollars, leaving a balance due on said rent contracts in the sum of Eighty-four and 40/100 ($84.40) Dollars." It was further agreed by counsel representing the parties litigant that in their answer the defendants, C. I. Cooper and L. W. Fouche, further alleged, in effect, "that plaintiff requested defendants to take and keep the goods for a period of ten (10) days that he might pay defendants the full amount due them and plaintiff took part of this furniture and kept it more than sixty (60) days and when the plaintiff failed to pay the balance due, defendants took possession of the goods under the terms of the contract; and by way of counterclaim defendants allege that plaintiff took and disposed of, without their consent, goods under contract to the value of Thirty-seven ($37.00) Dollars and that plaintiff is indebted to them in that sum." In this connection it may be stated that during the trial of the case his Honor, the trial Judge, disallowed the counterclaim.

In the answer of the defendant, Marvin Parks, he admitted that the said L. W. Fouche and C. I. Cooper are partners in trade doing business under the firm name of Cooper Furniture Company, and further admitted that this defendant, Marvin Parks, is a resident of Fairfield County and was an employee and salesman of the said furniture company.

The defendant Parks further admitted the following allegations contained in the plaintiff's complaint: "That between the approximate dates of January 1st, 1928, and September 1st, 1931, the plaintiff herein had, from time to time, purchased from the said defendant, Cooper Furniture Company, furniture and house furnishings in the sum of approximately Three Hundred Twenty-five ($325.00) Dollars, and had, by weekly payments, paid all of said purchases except the approximate sum of twenty-three dollars or less, the plaintiff being the owner of said purchased property and having same in his house at the Winnsboro Mills village, and the defendant, Cooper Furniture, as seller, having full knowledge of the dates and articles in question."

All other allegations of the complaint the defendant Parks denied.

The record shows that the plaintiff duly filed his reply to the counterclaim set up by the said C. I. Cooper and L. W. Fouche, denying the same.

In this connection we call attention to the fact that the defendants, L. W. Fouche and C. I. Cooper, filed a petition in the cause asking a dismissal of the action or for a change of venue, and the defendant Parks demurred to the complaint upon the ground that the complaint did not state a cause of action against him. The case came before this Court on appeal from the order of Judge Sease, who heard the motion thereon, refusing the said petition and overruling the said demurrer. This Court sustained the ruling and order of Judge Sease. See 169 S. C., 477, 169 S. E., 288. Thereafter, the case was tried on its merits at the October, 1933, term of said Court before his Honor, Judge E. C. Dennis, and a jury. Before the jury was drawn for the trial of the case counsel for the defendants requested the plaintiff to elect "whether it was a suit for obtaining goods under false representations, for conversion, or for fraudulent breach of contract." The trial Judge ruled that the plaintiff would not have to make the election until the testimony was in, his Honor stating, "I think the matter would all be included un-

der a breach of contract—they are suing under a contract."
In this connection, the following occurred:

"Mr. Dunlap: Before this jury is drawn, I think it is
nothing but right that I should now call attention of the
Court to the fact that this action may be one of two or three
causes of action, and I want the plaintiff to elect. My only
position, your Honor—I don't know—and from a reading
of that complaint, I can't tell whether that is a suit on ob-
taining goods under false representations, or whether it is
one on conversion, or whether it is one that, after having
obtained the goods, maliciously and wantonly misled and de-
ceived the plaintiff as to the goods. So, I just want them to
elect. If it is a conversion I want to know it; if it is obtain-
ing goods under false pretenses I want to know it. (Calls the
Court's attention to particulars of the allegations of the com-
plaint.)

"The Court: Before you go into that I will hear the
plaintiff. (Argument by Mr. Traylor.)

"The Court: Well, you have to elect whether it is a
breach of contract or tort, and whether a separate tort—
(Argument by Mr. McDonald, Sr., in which he takes the
position that, in a case of this kind, plaintiff is entitled to
have the whole testimony brought out, and then elect on
which question to go to the jury.)

"The Court: There is no doubt you are entitled to have
the testimony; and you are not required to make your elec-
tion at this time. Before the case goes to the jury, in order
to give them instructions, I think probably I would have to
know whether it is an action for breach of contract, or the
nature of it, because the law would be a little bit different. I
will postpone the decision as to what election should be
made, until the testimony comes out.

"Mr. Dunlap: I have always understood, your Honor,
that now is the time to make it. Of course, if it is a breach
of contract, the trend of the testimony would be along cer-
tain lines; and if it is a conversion, it would be along other
lines. And I am now asking it so we can protect ourselves on

our objections and on our cross examination. To leave it open until the time to go to the jury, your Honor will readily appreciate the position we are placed in. It is not a question of making the complaint more definite and certain; it is really a question of making them tell us what they are suing us for. And I think if your Honor will read that complaint, as I have done, that you will agree with me that it covers, you might say, a multitude of sins. (Citing allegations of the complaint.)

"The Court: I think it would be—I think the matter would all be included under a breach of contract—they are suing under a contract. All right, gentlemen, go ahead and let us have the jury."

The case having proceeded to trial, the plaintiff offered his testimony in support of the allegations of the complaint and at the conclusion of which the defendants made a motion for a nonsuit upon the following grounds:

"Mr. Dunlap: May it please the Court, we wish to move for a nonsuit on the whole case. Also, if that not be granted by the Court, then a nonsuit as to punitive damages, I am taking the position, your Honor, before the Court, that the contract under which these goods were purchased is nothing more nor less than a lease or contract for rent."

The trial Judge overruled the motion. In answer to propositions presented by counsel for the plaintiff and to argument of counsel for the defendants the trial Judge, in the course of his remarks, stated, in effect, that there was plenty of testimony to take the case to the jury, and if the action is for fraudulent breach of contract, "I have to charge them certain law. Now, it seems to me that, before I charge the jury, there will be an understanding as to which—either you have to tell the jury or I will have to tell them which it is, that is, I will have to decide whether or not to charge them the law for the fraudulent breach of the contract, as I understand that the fraudulent breach of the contract entitles the person to punitive damages, and that that is the only breach of contract that does permit it. And if it is not the breach of

contract, then fraud need not enter into it at all." In ruling on the motions, the trial Judge further stated: "If you are going to take the position that this is a willful taking, then fraud is not involved. If you are going to take the position that they came into the possession legally and then made away with the property, under the rights of these people, that seems to me, would be for the breach of the contract." In this connection, in answer to the statement made by counsel for the defendants, that they would like to know where they stood, his Honor stated that he would make the decision when he charged the jury, regarding the matters involved.

Thereafter, the defendants introduced testimony and the plaintiff called witnesses in reply.

At the close of all the testimony, counsel for the defendant, Parks, made a motion for directed verdict, which motion was refused. Thereupon a motion was made to direct a verdict generally. This was also refused, and the case being submitted to the jury, a verdict was rendered against the defendants in the sum of $435.07, actual damages, and punitive damages against the defendants, L. W. Fouche and C. I. Cooper, in the sum of $500.00, making a total of $935.07. On motion for a new trial, his Honor granted a new trial *nisi* reducing the verdict to $300.00 actual damages and $500.00 punitive damages, and judgment was duly entered for that amount, from which judgment the defendants have duly appealed to this Court.

For the purpose of a better understanding of the case involved, as presented to the Court, we quote at length from the testimony of the plaintiff, as follows:

"Q. How long have you lived in Winnsboro? A. About eleven years.

"Q. What have you done during that time? A. Been working in the Winnsboro Mill.

"Q. Did you have any transaction with the Cooper Furniture Company around January, 1928, did you purchase any goods from them? A. Yes, sir.  *  *  *

"Q. Did you have any transaction with the Cooper Furniture Company around January 1, 1928? A. I bought $171-.40.

"Q. Did you have any transaction with them between January 1, 1928, and September 1, 1931? * * *

"Q. How much furniture did you buy from these people during that time, as I have just stated, from January 1, 1928, to around September 1, 1931, how much in all? Have you any statement there to refresh your memory? If so, why you can do that. * * * A. I bought around $378.10 from the Cooper Furniture Co.

"Q. How much did you say it was? A. $378.10.

"Q. Now, how did you buy that, pay them cash for all of it or not? A. No, sir, I bought it on the installment plan.

"Q. Well, what became of that furniture? A. I stored that furniture with the Cooper Furniture Company.

"Q. Now, tell us how much was owing them when you stored it with them? A. It was twenty-three dollars and eighty cents, eighty or eighty-five cents.

"Q. State whether or not you had paid the rest. A. No, sir.

"Q. Had the other part of it been paid? A. No, sir. * * *

"Q. What happened to that furniture then? A. Well, they disposed of my furniture.

"Q. I mean, what transaction took place when you turned the furniture over to them? A. It was this: I had two children, I had a cook to take care of them at my home. I carried them to my grandfather's to take care of them. My wife aimed to do the cooking for us, and times were so hard, we thought we would come out cheaper, if stored. This furniture was to be stored through them. There was no special time for the furniture to remain from them.

"Q. Where did you go to make this arrangement, did you go to the Cooper Furniture? A. I went to the Cooper Furniture.

"Q. With whom did you make it? A. Mr. Estes.

"Q. Who was he? A. He was the sales manager and general manager of the Cooper Furniture Company, Winnsboro, South Carolina.

"Q. What took place when you went to see him about the furniture, what sort of agreement did you all make? A. Well, I went to ask them about carrying this furniture down to my father-in-law's, to store this furniture, and when I asked them, he said, 'You owe us some, a small sum, on the furniture, and I would rather you store it at my place, the Cooper Furniture Company, and want you to store it there. We won't charge you no storage; won't never be no storage down there, and I won't charge you no storage for this furniture to be stored here; but you can call for your furniture and get it.' And during this time Mr. Whitesides was the fellow I met up with, while storing the furniture. He wanted a stove. He didn't specify the stove I had, he wanted a stove like this. And he went with me to this place to see about the stove. Mr. Estes and myself and Mr. Whitesides and myself made the agreement about this oil stove. He was to take my oil stove, but didn't have no new one, to let Mr. Whitesides have it, and he was to take this oil stove away from me; that left me owing the Cooper Furniture $23.85.

"Q. Do you know, now, what furniture you turned over to him under that agreement of storage? Read out so the jury can hear you. * * * A. I have here one alarm clock on the second month, 22nd day—

"The Court: Don't give the dates you bought these things. Read the articles you claim you turned over to those people. A. One alarm clock, $4.50; one bed outfit, $32.50.

"Q. Talk out loud, now, Mr. Penley. A. One dining table, $7.50; two rocking chairs, $9.90; four straight chairs, $6-.00; one oil stove, $49.50; one dresser, $22.50; one safe, $17.50; four window shades, $5.00; one baby carriage, $14.50; four window shades, $9.00; one oven, $7.50; one pair of blankets, $8.50; one overn $7.50—

"Mr. Dunlap: What was that last—oven?

"A. One bed, $9.95; one spring, $3.75; second-hand mattress, $9.50; and one baby carriage, $17.50; one pair of blankets, $6.95; one oil range, $69.50; one linoleum rug— that is all I got from them.

"Q. State whether or not you had any other furniture that you turned over to the Cooper Furniture Company. A. That is what I bought on the installment plan. I had some that I paid cash for.

"Q. Did you turn that over to them? A. Yes, sir.

"Q. What was that linoleum rug? A. Eleven dollars. One mattress, $14.50; and one mattress, $11.50; one spring, $4-.95; one center table, $4.50; three cane bottom chairs, $4.50; one porch gate, $3.75; and one baby chair, $3.95; total for cash, $59.10.

"Q. Now, from whom did you get that furniture you paid cash for? A. Got it from Mr. Douglas.

"Q. Got all from him? A. No, sir.

"Q. What did you get from Mr. Douglas, you paid him for? A. One linoleum rug, two matresses, porch swing, three cane bottom chairs—that all that I have.

"Q. What happened to that furniture? A. It went with this other, it was stored with the other furniture.

"Q. Did you ever get it back? A. No, sir.

"Q. Do you know where it is? A. No, sir.

"Q. Were there any other items there you paid cash for, except from Mr. Douglas? A. Yes, sir; I got one center table, bought from the Cooper Furniture Company, I paid cash for; and one porch gate, and I believe that is all.

"Q. What happened to it? A. It went with this other.

"Q. Who owned all that furniture, whose was it? A. It was my furniture.

"Q. It wasn't your wife's? A. No, sir.

"Q. Now, where is that furniture now, Mr. Penley? A. I don't know where that furniture is.

"Q. Did you try to find it, try to get it? A. Yes, sir.

"Q. Did you make a search for it? A. Yes, sir.

"Q. Tell the jury about it. They don't know the circumstances. A. But this furniture was stored, I stored all this furniture at the Cooper Furniture Company, except one bed, springs and mattress, and I kept that with the other stuff my wife had bought from Mr. Cooper in her name. And she gave up her stuff; and they come and got her stuff and taken this bed, spring and mattress with her stuff. And Mr. Parks was the man that come and got the stuff. He said that Mr. Estes had repossessed my stuff, and I asked him how Mr. Estes done that. He said he didn't know; I would have to see Mr. Estes about that. So, I came up to see Mr. Estes, and Mr. Whitesides came with me. I asked Mr. Estes about; and Mr. Estes said, 'No, sir; he had not repossessed my stuff; and that my stuff would be ready for me any time I would call for it; that I could get my furniture any time I call for it,' he said. So, later I came back again and asked about this furniture again, and Mr. Parks spoke up and said he had sold my swing to somebody, I forget the name he called. Mr. Estes said, 'No, he had not. It was still in the warehouse, and I could get it any time I called for it.'

"Q. What happened then, how many trips did you make trying to locate your furniture? A. I made two trips to Mr. C. W. Estes, I think it was—talked to him; and I made a number of trips to Mr. Estes, manager, now, and Mr. Parks.

"Q. Was Mr. Estes there when you made your latter trips, the last time you went, was he still employed with the company, or had he gone out? A. He was gone out, I think.

"Q. Who did you talk to then about the furniture? A. I talked to Mr. Parks, and his brother.

"Q. Have you ever been able to locate it? A. No, sir; I have never been able to locate it.

"Q. How many times have you ever talked to Mr. G. M. Estes about it? A. I talked to him twice, and he give me no satisfaction about it, and I never bothered him any more about it. And I heard it had gone, and he had left here, and had gone.   *   *   *

"Q. Was any storage charged you by Mr. Estes? A. He came down to collect three dollars storage at the end of thirty days; that was for storage.

"Q. What did you do then? A. I told him I wasn't to pay no storage; he promised to store it free of charge—got the automobile tire I sold Mr. Goff. Mr. Goff made a deal with him, and he was to pay me $2.85. Gave me a bill for $2.85 on my account—which he never did do. And he said he would take $2.85 for the storage for thirty days.

"Q. Is that storage paid? A. Yes, sir; that is the way it was paid, with the $2.85 he owed me.

"Q. Did you hear any more about the storage, from him? A. No, sir; I never heard any more about the storage.

"Q. Did you have an opportunity to sell your furniture while they had it? A. Yes, sir; a fellow said he would buy it, and look at it; he didn't make no offer on it or nothing like that. He said he would buy my stuff; and I came to ask about the stuff then, and Mr. Parks and Mr. Estes said they didn't know anything about my furniture.

"Q. I wish to ask your attention to this: Mr. Penley, did you have any conversation with Mr. G. M. Estes about how much was due on the furniture? A. He come to Chester— how much it was.

"Q. What took place? A. Yes, Mr. Estes came up here for me to go to Chester with him, to see how much I owed on this furniture.

"Q. When was this, was this before the storage? A. This was before the storage.

"Q. All right. A. So, I was late about getting up here, and Mr. Estes went to Chester and left me. But, when he came back he brought a statement of $23.85 and give it to me.

"Q. What was that? A. A statement of $23.85 that I owed on this bill.

"Q. Did he say that was all you owed them? A. He said that was all I owed them.

"Q. Have you that statement? A. No, sir; I have lost that statement somewhere.

"Q. (Hands witness papers), look at these papers and see what you call them. A. These are supposed to be receipts.

"Q. They represent payments you made—A. Yes, sir; that is what I paid on my furniture.

"Q. Read them; start at the first and read the amounts. Is that all the receipts, or did you lose any of them? A. I lost some—

"Mr. Dunlap: Don't lead the witness.

"A. Here is the receipt here—

"Q. Just go through them. A. This here is done cut off; can't tell you how much that is.

"Q. What is on the bill there? A. 'Cooper Furniture Company' on the receipt.

"Q. What is the first one?"

Whereupon, the witness, the plaintiff in the case, offered numerous receipts totaling $257.50 on paper containing the name of "Cooper Furniture Company." As already answered by the witness, he had lost some of the receipts. All of these receipts with the exception of three, which were objected to by the counsel were admitted in evidence.

Continuing his testimony, the plaintiff testified as follows:

"Q. Now, Mr. Penley, how long have you been without your furniture—has it been out of your possession? A. Between the 16th and 21st of September, 1931.

"Q. Have you been inconvenienced by reason of it being away from you? Have you had any loss in connection with their taking it and in selling it? A. I have stood a chance of selling it. I could have sold it.

"Q. Now, were you and your wife living together at that time? A. Yes, sir.

"Q. How long after that time did you all still live together? A. We separated the fifth of February, 1932.

"Q. Was that a mutual separation? A. Yes, sir.

"Q. What happened, now? How did you all live between the time you all stored that furniture, up to the time you and your wife separated? A. We boarded.

"Q. With whom? A. With Whitesides.

"Q. And how long was that over, how long a period? A. About four months, I reckon.

"Q. Where were the children in the meantime? A. They were at their grandfather's.

"Q. How long had they been there? A. They had been there—I just can't call exactly—about six months, something like that.

"Q. Did you and your wife both work in the mill? A. Yes, sir."

The plaintiff, T. H. Penley, was cross examined by counsel for the defendants on the matters he testified to on direct examination and on some of the matters he was cross examined at length by counsel, and was asked a number of questions regarding a stove involved in the transaction. It is the contention of counsel for respondent that the plaintiff made all of the matters clear. In our opinion it was proper under the testimony, for these issues to be submitted to the jury.

C. H. Douglas, a witness for the plaintiff, in the course of his testimony stated, in effect, that at the times involved herein, he was in the furniture business and sold to the plaintiff the following articles of furniture: One mattress, two cane chairs, one porch swing, and a linoleum rug, and that the plaintiff had paid him for these goods. In this connection we call attention to the testimony of the plaintiff wherein the plaintiff stated that the defendants, L. W. Fouche and C. I. Cooper, had made way with these goods, purchased from Mr. Douglas, at the time they made way with the goods which the plaintiff purchased from these defendants.

Mr. E. O. Whitesides, a witness for the plaintiff, stated, in the course of his testimony, that he heard a part of the conversation that took place between the plaintiff and Mr.

Estes, representatives of the Cooper Furniture Company, with regard to the furniture in question, and especially with reference to rent for storage of the same. Mr. Whitesides also testified, in effect, that he got from the Cooper Furniture Company the stove which they held for the plaintiff. Mr. Whitesides' testimony, in effect, corroborated the testimony of the plaintiff, that is, as to the matters he testified to.

There were also other witnesses who testified for the plaintiff, whose testimony, in part, tended to corroborate the testimony of the plaintiff. In this connection it may be stated that there was testimony tending to show that Mr. Parks and Mr. Estes were, at certain times when the transaction between the plaintiff and the defendants took place, agents for the defendants, L. W. Fouche and C. I. Cooper, in the said furniture business.

Upon refusal of the defendant's motion for a nonsuit, the defendants offered testimony. The defendant, Marvin Parks, stated that he did not know much about the case, but that while he was in the employment of the defendants, Cooper Furniture Company, he went down for the furniture in question; and while in the employment of these defendants, when he was told to do anything he did it. This defendant further stated, in effect, that Mr. Penley, the plaintiff, consented to his taking the furniture in question. It also appears from his testimony that he was out of employment for some time after the transaction in question occurred, but had been re-employed by the Cooper Furniture Company a short time before the trial, stating, however, that he was only getting part time. He denied having disposed of the furniture in question, saying he had no authority over it. It clearly appears from the testimony of Mr. Parks that he was working for Cooper Furniture Company at the time they got the property in question.

In the course of the testimony of G. M. Estes, a witness for the defendants, he stated that he went to work for the

Cooper Furniture Company in June, 1913, and continued to work until February, 1932; that he was working as store manager and collector for this company; that during the said period of time, while he was in the employment of the said furniture company, he recalls a contract he had with the plaintiff, T. H. Penley. It further appears that at the time in question Mr. Estes was manager of the Cooper Furniture Company, and, in the course of his testimony, referred to having had certain lease contracts in his possession, at least, for a few days at one time, and it appears from his testimony that one of the contracts was signed by the plaintiff. In this connection Mr. Estes further testified, as follows:

"Q. Mr. Estes, I want you to tell the jury what you did in reference to Penley, in connection with those various contracts, as to carrying out the terms of the contract, what did you do? A. Mr. Penley was due to pay on Saturday of each week, on his account, sir; and for the period of about five months there, why, I collected about once a month from him.

"Q. Have you the books here showing those various collections? A. Yes, sir; it is over there.

"Q. (Hands book to witness.) Refer to Mr. Penley's account there. A. (After referring to book), Yes, sir.

"Q. Did you make those entries on there? A. No, sir.

"Q. Who did make those entries? A. Mr. Gilmer and Mr. Riddle, from Chester, at that time.

"Q. Does that account show the various payments made by Mr. Penley? A. Yes, sir.

"Q. After examining that account, and in reference to those rent leases that you offered, how did he stand with the Cooper Furniture Company with regard to keeping up his payments? (Answer stricken out.)  *  *  *

"A. He was very much in arrears with his account.

"Q. Very much in arrears? A. Yes, sir.

"Q. As a result of that, Mr. Estes, what did you do so far as Mr. Penley is concerned? A. Well, I done about all I could do, I guess. I was after him every week about his pay-

ing. And he made the statement to me—which I know was correct—that he was out of a job at the Winnsboro Mills and couldn't pay; and didn't pay. And, finally, he had some domestic trouble.   *   *   *

"Q. (Mr. Dunlap) Then what did you do? A. Then, after he carried it over there, I requested he turn the stuff back to the store. But before I done this I went down to the village to see him. And so I went on and got Penley, and he agreed to let me have the stuff the next day, the furniture. So, the following day I sent Mr. Parks down for it; and we had a list, what he delivered to Mr. Parks. And then on the following day—

"Q. (Hands witness paper) Is that the list? A. Yes, sir; this is the list. And he delivered this stuff—

"Q. One minute. In whose handwriting is that? A. That is my handwriting, and Mr. Parks' handwriting."

After discussion by counsel before the Court, as to the admissibility of certain matters, Mr. Estes continued his testimony, as follows:

"Q. What is that, then? A. This is the list that we checked the goods into the store by.

"Q. Got it from where? A. This was delivered to Mr. Parks by Penley, in the village.

"Q. Then what happened? A. The day following this, Penley came up to the store and made the statement to me, if I am not mistaken, his father—he was going to Columbia the next week and see his father—if I would hold his stuff until he went down and saw his father about paying the account off.

"Q. When was that he came to you? A. That was the following day. And I agreed to hold it for him until he could go down and see his father, because the stuff was worth the balance he really owed on it; and by doing that I figured that the Cooper Furniture Company would break even on the account. And I agreed to hold it until the following week. So, the next week he came back again and told me he had not

been able to see his father, or whoever it was to pay the account off. So, I held it a while longer for him; and so finally I got tired of holding it; and this part we could sell, we had it cleaned up and put on the market again.

"The Court: Put on what? A. On the market—sell.

"Q. How long did you hold it? A. I imagine—I expect I held the stuff about ninety days, may be longer. I didn't have occasion to sell it; had plenty of other furniture to sell. Just left it laying together there, because it was in a bad condition.

"Q. Do you know of your own knowledge what became of the difference of the stuff between this paper and these papers (indicating papers), do you know what Mr. Penley did with the balance of it? A. No, sir; I don't.

"Q. Of your own knowledge, now? A. He claimed—the shades were worn out, and the blankets were worn out. That stuff, he had had the furniture some four years or more."

Following discussion by counsel and the ruling by the trial Judge that the plaintiff was not suing for the furniture, the witness further testified:

"Q. All right, Mr. Estes, Mr. Penley has testified that he made repeated visits to your store about this furniture and tried to get it. Tell us about that, please, sir. A. He didn't make any repeated visits up there that I know of. I don't think he did; I didn't see him.

"Q. What about this furniture that he claims wasn't on the contract that was turned over to you? A. There wasn't any furniture delivered to us that didn't belong to us, except may be one rug, and probably a little table there, and we gave them back to him, because he delivered them to us, and we delivered them back to him like he did to us.

"Q. How long did you keep them before you returned them to him? A. When he found out his uncle, or whoever it was, wouldn't pay the bill off, he came up there after them.

"Q. He says that he talked with Mr. Parks about a swing, and Mr. Parks said he had sold it, and you told him it was still on hand? A. That is news to me.

"Q. All of the stuff, then, that didn't belong to the Cooper Furniture Company had been returned to Mr. Penley? A. Yes, sir.

"Q. Have you any way of fixing the time that he delivered this stuff to you, Mr. Estes? A. To the best of my recollection, he delivered it to us along about the last of August; and we kept the stuff way up in cold weather some time. Not only that stuff, but we had other furniture back in the warehouse there that we didn't need, and we stored it back there so that if we did need it we could bring it out and sell it with other second hand furniture we had on hand. We didn't necessarily hold it for any one, because I had already informed Mr. Penley—

"Q. Never mind your opinion— A. When he failed to agree, what was agreed on, to pay the thing off, naturally, he fell down on that; and so I didn't fool with him any more about it. I just did him the favor until he went down to see his uncle—I don't know who it was he went to see. I don't know whether he ever went to see them, I don't know whether he did or not.

"Q. So, from the time, then, that you delivered him the other furniture, until this time, have you ever had any other conference with Mr. Penley in regard to this matter? A. No, sir.

"Q. When did you leave Winnsboro, Mr. Estes? A. In February, 1932.

"Q. Then, in August or September, with the exception of the times you have testified to, up until 1932, did you get any complaint at all from Mr. Penley? A. Not a bit, no, sir.

"Q. Mr. Estes, when you were talking with Mr. Penley about keeping this furniture until he could see his father-in-law or whoever it was, did you tell him then anything about, that if he didn't pay that, you would dispose of it? A. Yes, sir.

"Q. And what did Mr. Penley say? A. Well, just to give him a chance, until he could get another week on it—until

he could go down and see him, he could pay it off if he only had the money—

"Q. And the next week passed by? A. Yes, sir; and the next one.

"Q. And the next week? A. Yes, sir; several of them.

"Q. Tell those gentlemen about this automobile tire business, they claim to have paid you $2.85. A. Mr. Goff had a United States Royal Cord Tire on the back of his car, and I was down at his house there one Saturday afternoon and I asked him, I said, 'How about trading you out of your good tire you got on the back of that car there?' He said he would trade—

"Q. Well, without the conversation between you and Mr. Goff, what was the result of it? A. We traded tires. I swapped him three tires for the one he had on his car—used tires, and gave him two dollars to boot. I gave him a receipt on his furniture for two dollars.

"Q. Gave who a receipt? A. And that closed the transaction between me and Mr. Goff in regard to the tires.

"Q. Did you have any conversation with Mr. Penley about that? A. Mr. Penley afterwards—Mr. Goff changed his tire at my house on Saturday afternoon and changed the tires, and put it on my car. And a few days after that Penley came and told me that Mr. Goff had purchased the tire from him and let him have three dollars on it and would hold me responsible for the balance. I said, 'You can't do that, because I have traded tires with Mr. Goff, and paid him for it.'

"Q. Did you at any time give Mr. Penley any receipt for it? A. No, sir; not a bit in the world.

"Q. Did you have any agreement with Mr. Penley that $2.85 was to go on storage? A. No, sir.

"Q. Did you charge Mr. Penley any storage on this furniture? A. No, sir.

"By the Court: Q. Was all of this furniture that came back into your possession covered under one contract or under different contracts? A. Under several of them there, sir; we had several different contracts there on Mr. Penley.

"Q. Well, when you collected a dollar at the time, what did you apply it on? Did you treat it as if it was one contract? A. I give him what you might say, a dollar credit on his general contract.

"Q. And not on any particular contract? A. Not on any particular contract, no, sir.

"Q. So, in that way you kept them all alive, that it? A. Yes, sir.

"Mr. Dunlap: Q. When Mr. Penley would make a payment, he wouldn't give you any instructions as to any particular contract? A. No, sir; just paid it on his account."

We call attention to the following portion of the testimony of the witness, Mr. Estes, given on cross examination:

"Q. Under a contract such as Mr. Penley had, and such as you generally make, a man can pay any account down to one dollar and you would still have a right to repossess it, have you not? A. According to law, yes, sir.

"Q. And these contracts are circulated especially through the mill village, are they not? A. If I am not mistaken, people all over Fairfield County have bought stuff from the Cooper Furniture Company, and under a contract like that (indicating paper).

"Q. Do you cater to the mill folks? A. Anybody can buy that wants to.

"Q. I asked you—you cater to the mill folks?

"The Court: Answer yes or no.

"A. Yes, sir.

"Q. That is all I want. When you repossessed Mr. Penley's furniture you repossessed it and put it back in the market, about what time? A. Something like ninety days after they repossessed.

"Q. That would be along about December? A. Yes, sir; along about December.

"Q. Did you give Mr. Penley notice of the fact that you were going to put it on sale? A. I notified Mr. Penley thirty or sixty days before.

"Q. Who notified him? A. Personally, myself.

"Q. Did you tell Mr. Dunlap that, that you notified him? A. Yes, sir.

"Q. I understood you to say, if he didn't pay it up you were going to repossess it? A. I told Mr. Dunlap that I got Penley down at the mill village and told him I would have to take my furniture back, and told him I would make an arrangement to get it the next day; and got it the next day.

"Q. When you put it back in the market to resell to the public, did you tell him the actual time you put it on the market, to resell it? A. No, sir.

"Q. The only thing you told Mr. Penley, about thirty days before that, if he didn't pay up, you would put it on the market and sell it? A. If he didn't get paid off, the agreement he had with me, was going down to Columbia to get his people, some relative, to pay his account off; if he didn't do it, I was to go ahead and sell it. The last time he told me that he couldn't get the money, I told him I was going to sell it.

"Q. That was thirty days before you did? A. That was thirty or sixty days before putting on the market.

"Q. Why did you put it on the market right then? A. We didn't have occasion to; we didn't need it.

"Q. Did you ever advertise it? A. No, sir.

"Q. You didn't put it up before the court house and sell it? A. No, sir.

"Q. You simply put it up without further notice to Mr. Penley and sold it? A. Yes, sir. * * *

"Q. You and Mr. Parks were the two men that dealt with Mr. Penley throughout all this sale and negotiation? A. I didn't sell Mr. Penley anything except the stove.

"Q. You took it back and put in storage? A. No, sir; I didn't take it back and put in storage.

"Q. You didn't have a thing to do with it, the stove? A. Yes, sir; sold it to Mr. Whitesides.

"Q. How much did Mr. Penley owe you at the time you put it on sale? A. I don't know exactly what he did owe us at that time; the record will show."

The witness Estes further stated, on cross examination, in effect, that according to the records of the company, the company had sold to the plaintiff furniture in the amount of over $300.00, and that the plaintiff had paid the account down to $83.00 when the goods were repossessed and put on sale.

L. W. Fouche, one of the defendants in the case, gave testimony regarding the financial condition of the Cooper Furniture Company, but gave little or no information regarding the contract involved in this case. We assume that he was not familiar with the transaction but had left the management of that store to one of his managers.

In reply, the plaintiff recalled the witness, E. O. Whitesides, who testified, in part, as follows:

"By Mr. Traylor: Q. Mr. Whitesides, Mr. G. M. Estes, the former manager, said that he had learned that Mr. Penley was storing furniture at your home, beforehand, before the time he was hauling it away, was that true or not? A. No, sir.

"Q. He also testified of his own knowledge that Mr. Penley and Mrs. Penley had separated before that furniture was stored, say whether or not that is true? A. No, sir; that is not right.

"Q. How long did they live together after that furniture was stored, if you know? A. I couldn't say; it was a good long time, though.

"Q. Several months? A. Longer than that; four months, I expect; practically longer than that."

In the reply testimony, the witness Whitesides further stated, in effect, that the furniture company got from the house of the witness all of the furniture the plaintiff had carried there for use, consisting of the stove referred to and also bed and wardrobe, etc. The witness, Mr. Whitesides, al-

so stated that some of the furniture at his home was owned by Mr. Penley and some by Mrs. Penley.

In this connection, we desire to state that there was testimony tending to establish all the material allegations set forth in the complaint.

Under Exceptions 1 and 2, appellants impute error to the trial Judge as follows:

### "EXCEPTION 1

"That his Honor erred in construing the instrument sued on as being a chattel mortgage when he should have held that they were lease agreements.

### "EXCEPTION 2

"That if his Honor had properly construed the instrument sued on as lease agreements, then the Court should have held that the defendants had a right to possession of the property, and that it was not necessary to have any sale."

Under our view of the record in this case, the goods in question were not purchased by the plaintiff under a lease agreement, but purchased under a contract properly construed as a chattel mortgage, and the mortgagee had no right to possess the property so sold except for the purpose of selling it in the manner prescribed by law, but it was necessary to have a sale in the manner prescribed by law. We think the record amply supports this conclusion. Therefore, these exceptions must be overruled. In connection with what we have stated regarding Exceptions 1 and 2, we desire to state that we, of course, have reference to the original contract of sale and not to the independent contract of storage later entered into.

Under Exception 3 appellants impute error to the trial Judge in the following particulars: "3. That the jury disregarded the charge of his Honor as set forth in defendants' seventh request to charge in that the Court in substance charged no indulgence, extension of time or agreement to hold said property will reinvest the title in the mortgagor,

and the mortgagee may dispose of the same in any manner he desires. But, if the value thereof be greater than the amount due mortgagee, then an action for accounting can only be held, for he is not limited to accounting only. He can bring an action to prove the value of the property. His Honor in refusing a new trial on this ground erred."

The seventh request to charge presented by the defendants on the trial of the case, to which reference is made in this the third exception is in the following language: "I charge you that upon breach of conditions of a rent lease or chattel mortgage the title vests in the mortgagee and no indulgence, extension of time or agreement to hold said property will reinvest the title in the mortgagor and the mortgagee may dispose of same in any manner he desires but if the value thereof be greater than the amount due mortgagee then an action for an accounting can only be had."

In answer to appellants' contention made under this exception, we call attention to what the trial Judge had to say in charging this request. His Honor, at the time, read Requests No. 5 and No. 7 of the defendants. Request No. 7 we have quoted. Request No. 5 reads thus: "I charge that a mortgagee of a chattel selling it at private sale can be held liable only for the value thereof, with interest." Having read Request No. 5 and Request No. 7 together, his Honor made this statement to the jury: "I don't know that an action for an accounting is the only one. You can bring an action to prove the value of the property. I think you can recover without it being in that particular form—action for accounting." We do not think the jury disregarded his Honor's charge, nor that his Honor committed error in refusing to grant a new trial on this ground. This exception is, therefore, overruled.

Appellants impute error to the trial Judge under Exception 4 as follows: "That his Honor erred in charging the jury that if the mortgagee takes possession of the property and sells it in some way other than that specified by the law, one of two things will be the result: If he does not get

enough property and sell it according to law, he cannot get any more or do anything else. The error being that he should have charged the jury the above law with the addition 'unless mortgagor and mortgagee agreed to some other condition,' and he should have charged the jury that the agreement between the mortgagor and the mortgagee providing 'and any failure to pay an installment of said rent when due shall forfeit this option and all payments therefor or thereafter shall be regarded only as rent.' "

In charging the jury on this question, his Honor made this statement: "The law is, gentlemen of the jury, where property is taken under chattel mortgage, it must be advertised and sold at public auction. If that is not done—if the person who holds a chattel mortgage takes possession of property and sells it in some other way other than that specified in the law, one of two things will be the result. If he doesn't get enough property or doesn't get it all, and sell it according to law, he can't get any more or do anything else. If he takes more property than the debt, and doesn't sell it according to the statute, then he is liable to account for the value of the property. To make that plain to you, suppose a man owes a balance of ten dollars on a horse worth $150.00. The holder of the mortgage can take that horse, advertise him for sale, according to law, and sell him, and if he brings ten dollars, that is the end of it. He may be worth $150.00, but if at public auction he brings ten dollars, the debt is paid; the horse is gone, and the man that gave the chattel mortgage on him can't do anything. But suppose the owner of the chattel mortgage takes the horse, and he doesn't sell him at public sale, after advertising, or sells him at private sale, or keeps him himself, and the horse dies, the man who gave him the mortgage, the owner of the horse, can sue him for the value of that horse, the one hundred and fifty dollars less the ten dollars. That is the difference in the procedure."

As we understand appellants, appellants do not contend that this charge on the part of the trial Judge was wrong, but contend that his Honor should have gone a little further

and "should have charged the jury in addition to the above that unless the parties agreed on some other conditions and he should have construed this agreement between the parties to say that these parties having agreed upon another method, to wit: 'upon failure to pay an installment of said rent when due shall forfeit the option to purchase and that under these conditions if true, the appellant had a right to sell and there was no necessity for any accounting between the parties.' " It was not necessary for the trial Judge to instruct the jury as suggested by the appellants. The jury evidently had in mind the fact that the parties before the Court were free to enter into additional conditions in connection with the contract involved. Furthermore, at the conclusion of his charge, his Honor inquired of counsel if there was anything further, and counsel for the parties before the Court answered that there was not. Evidently, counsel for the appellants thought at that time that his Honor had covered the law applicable to the issues presented to the jury. We fail to see wherein the defendants were prejudiced in the respect charged under this exception, and the same must be overruled.

Under the fifth exception the appellants impute error to the trial Judge in the following particulars: "His Honor erred in charging the jury that this action is one for breach of contract. Whereas, he should have charged the jury that it is one for conversion, or it was an action based upon fraud, deceit and swindling to obtain possession of the property in question."

In presenting the merits of this exception, the appellants, as set forth in their brief, ask the question, "Was there a breach of contract of the original agreement or was it a breach of contract of the storage agreement?" The Court did not, according to appellants' contention, differentiate between these two, nor did the Court advise the jury which contract the appellants had breached, if any. We may ask, Was it proper for the Court to advise the jury which contract the appellants had breached, if any? We think not. It is further contended, in effect, by appellants that the only

contract that could have been breached was the alleged storage contract, for the reason that there was testimony sufficient to go to the jury that appellants agreed to store the furniture in question, but contend, in effect, that there could not be such a legal agreement when the title and right to possession was in the appellants. Appellants further contend, as set forth in appellants' brief, that "if it was the breach of the original contract then as charged by the Court no indulgence granted by the appellant would change the status of the property or give title to the respondent and the disposing of same was no breach as he owed no duty to anyone." It appears to us that it was the contention of plaintiff throughout the trial of the case that the defendants had fraudulently breached the alleged contract to store the furniture in question, and that same had been unlawfully disposed of by the defendants, and that the case was tried on that theory. It is true that the question of chattel mortgage is often referred to in the case, but it is clear that the plaintiff's real grievance for which he asks damages is that the defendants fraudulently breached the contract to store the furniture in question, and that the defendants had unlawfully made way with the said goods. We think his Honor, the trial Judge, gave the jury proper and sufficient instruction on the law applicable to the questions involved. This exception is overruled.

Appellants' sixth exception reads thus: "That his Honor erred in eliminating from the answer the allegation of counterclaim, which allegation would have shown by testimony that certainly all of the furniture was not returned to defendants."

In our opinion, the trial Judge committed no error in the respect alleged under this exception, and the exception is overruled.

Exception 7 reads as follows: "That the contract of storage was indefinite as to time of maturity in that the plaintiff testified that it was to be held until conditions got better at the cotton mill or, in other words, defendants were to hold

the furniture for an indefinite period of time. That being the case there was no contract."

Granting as true the facts set forth under this exception, that would not give the defendants the right to sell and dispose of the furniture in the manner testified to by the plaintiff, and, in part, admitted by the defendants. The exception is overruled.

Under Exception 8, the appellants impute error to the trial Judge as follows: "That his Honor erred in allowing plaintiff to testify by reading the articles alleged to have been delivered to the Cooper Furniture Company from a list made up by plaintiff from memory over the objection of defendants' counsel, when the defendants introduced a written instrument showing what was actually delivered at the time, to wit: in August or September."

We do not think the defendants were prejudiced by this ruling. As we understand, the plaintiff, in the course of his testimony, made it clear that, independent of the paper objected to, he knew the list thereon to be correct. The exception is overruled.

Under Exceptions 9, 11 and 12, error is imputed to the trial Judge in refusing to direct a verdict for the defendants as to actual and punitive damages. In answering this contention, we deem it sufficient to state that a study of the testimony convinces us that there was ample evidence to take these issues to the jury. Of course, we do not know whether the testimony given on behalf of the plaintiff was true or not, but that was a question for the jury. Exceptions 9, 11 and 12 must be overruled. Punitive damages were not asked against the defendant Parks.

Exception 10 is in the following language: "That the jury disregarded the charge of his Honor wherein under the fourth request of the defendants it was charged that the contract agreement and the storage agreement must be construed together, and the defendants occupied a dual capacity and could exercise all of their rights under the contract agreement."

A reading of the record fails to convince us that the jury disregarded the charge of the trial Judge. The exception is, therefore, overruled.

Under Exception 13 appellants impute error to the trial Judge as follows: "That his Honor erred in refusing to require plaintiff to elect before any testimony was taken as to whether his suit was one for obtaining goods under false representation, for conversion, or for fraudulent breach of contract."

In ruling on the defendants' motion to require the plaintiff to elect in the respect set forth in this exception, after hearing counsel for the litigants, his Honor stated: "I think the matter would all be included under a breach of contract —they are suing under a contract." The case was tried on this theory, and it is our opinion that the defendants were not prejudiced by the action of the trial Judge in the matter. The exception is overruled.

Exceptions 14 and 15 are as follows:

"14. That, if the suit was for conversion, his Honor erred in allowing punitive damages in any amount.

"15. That the presiding Judge having held that this is not an action for conversion, punitive damages are not recoverable for willful or wanton disposal of the property without the formalities prescribed by the statute, and it was error to refuse the motion for a direction of a verdict for the appellants on the ground that no fraudulent act accompanied the alleged breach."

In our opinion, the questions raised under these exceptions are sufficiently answered by what we have stated in our consideration of the other exceptions, and by the record which we have quoted in this opinion. The exceptions are, therefore, overruled.

All of the exceptions are overruled, and it is the judgment of this Court that the judgment of the lower Court be, and is hereby, affirmed.

Mr. Chief Justice Stabler, Mr. Justice Bonham and Mr. Acting Associate Justice J. Henry Johnson concur in result.

Mr. Acting Associate Justice C. J. Ramage concurs.